UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2010 AUG -3  PM 2: 15

BY _____
DEPUTY CLERK

KIM SULLIVAN,                          :
                                       :
        Plaintiff,                     :
                                       :
v.                                     :        Case No. 5:09-cv-123
                                       :
ALLSTATE INSURANCE CO.,                :
                                       :
        Defendant.                     :

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**
(Doc. 17)

        This matter came before the court on April 7, 2010 for a hearing on all pending

motions, including the Motion for Partial Summary Judgment (Doc. 17) filed by

Defendant Allstate Insurance Co. ("Allstate").  Allstate seeks summary judgment with

regard to Plaintiff Kim Sullivan's consumer fraud and bad faith claims.  Ms. Sullivan

opposes that motion.

        At the April 7, 2010 hearing, the court also granted in part and denied in part Ms.

Sullivan's motion to compel, requiring Allstate to produce its claims file and any memos,

e-mails, and correspondence related to Ms. Sullivan's claim.  The court then granted Ms.

Sullivan's request for a continuance,[1] and extended the deadline for Ms. Sullivan's

opposition until thirty days after Allstate's compelled production was served.  That

deadline has passed and Ms. Sullivan has filed nothing further.  On July 12, 2010,

Allstate requested that the court rule on its pending motion for partial summary judgment.

        Kim Sullivan, is represented by Todd D. Schlossberg, Esq.  Allstate is represented

by Richard H. Wadhams, Jr., Esq. and Robin O. Cooley, Esq.

---

[1]  This was the second extension granted to Ms. Sullivan for the filing of her opposition.

## I.  **Undisputed Facts.**

On May 16, 2003, Ms. Sullivan was injured in a single vehicle accident in which she was a passenger in a vehicle driven by Patrick Atkinson.  At the time of the accident, Ms. Sullivan was seated in the front passenger seat of Mr. Atkinson's truck.  The truck went over an embankment and came to rest in the woods.  Ms. Sullivan was ejected from the truck and was transported from the scene by ambulance.  She alleges that she sustained injuries to her head, face, jaw, arms, and left leg.

At the time of the accident, Mr. Atkinson's vehicle was covered by an automobile policy issued by Allstate (the "Atkinson Policy") with liability limits of $25,000 per person and underinsured motorist ("UM") limits which are disputed.  As the Atkinson Policy was issued in South Carolina, its liability coverage limits have been increased, by operation of law, to comply with Vermont's statutory requirements.  On or about December 26, 2004, Ms. Sullivan accepted the $25,000 liability limits under the Atkinson Policy in settlement of claims against Mr. Atkinson and Allstate arising out of the accident.[2]

At the time of the accident, Allstate Policy No. 0 84 480150 09/16 (the "M.S. Policy") was in effect and covered a policy period from March 16, 2003 to September 16, 2003.  The M.S. Policy was issued to and purchased by Kim Sullivan's mother, Maryanne Sullivan.

The M.S. Policy sets forth UM limits of $100,000 per person/$300,000 per occurrence.  Its Insuring Agreement states that "[t]his is a legal contract between **you** and **us**."  (Doc. 18-5 at 16.)  "**You**" or "**Your**" are defined by the M.S. Policy to mean the policyholder named on the Policy Declarations, which is Maryanne Sullivan, and that policyholder's resident spouse.  (Doc. 18-5 at 18, ¶ 11.)

---

[2]  Neither party claims this release bars Ms. Sullivan's claims against Allstate in this action.

"Kimberly" is a "Driver Listed" in the M.S. Policy's Auto Declarations.  The UM section of the M.S. Policy defines an "Insured Person" to include "you [the named insured] and any resident relative" and "any person while in, on, getting into or out of [or getting on or off] an insured auto with [reasonable belief of] your permission." (Doc. 18-5 at 426.)  The UM Section of the M.S. Policy further provides:

> [W]e will pay [those] damages [which/that] an insured person is legally
> entitled to recover from the owner or operator of an
> [uninsured/underinsured] auto because of:
>
> 1.  Bodily injury sustained by an insured person[.]

(Doc. 18-5 at 26.)  The M.S. Policy contains a provision in the UM section governing arbitration which provides in relevant part as follows:

> If the insured person and we don't agree on that person's right to receive
> damages or on the amount, then upon mutual consent, the disagreement
> will be settled by arbitration.  If the insured person and we do not agree to
> arbitrate, then the disagreement will be resolved in a court of competent
> jurisdiction.

(Doc. 18-5 at 28.)

There is no evidence that Kim Sullivan reviewed the M.S. Policy prior to its purchase by her mother.

In a letter dated July 10, 2006, Ms. Sullivan's counsel described at length the state of Ms. Sullivan's recovery and her prognosis from the prospective of both counsel and Dr. Jeffrey A. Crandall, D.D.S.  Included in this letter were Ms. Sullivan's medical records up to May 13, 2006.  At the time, Ms. Sullivan's current medical and dental bills totaled $6,631.50.  She stated, through counsel, that "[o]bviously, should [she] eventually undergo TMJ surgery, her bills will be much, much higher." (Doc. 18-7 at 4.)  Ms. Sullivan's counsel predicted that Ms. Sullivan's lifelong future medical expenses would be $10,000 to $15,000, or more if she requires surgery.  Ms. Sullivan, through counsel, requested that "Allstate tender the available limits of the underinsured motorist coverage" under the M.S. Policy.  (Doc. 18-7 at 5.)

3

Dr. Crandall's May 13, 2006 report was included in Ms. Sullivan's demand for the UM policy limits under the M.S. Policy. Both parties selectively quote from the Crandall report, and use it to value Ms. Sullivan's claims. The court therefore sets forth the report in its entirety:

> I have reviewed my records and the materials you have provided me regarding Ms. Sullivan's past medical history from Dr.[]s Hardy, McKechnie, Culver and Fisher. She was last seen in this office on May 8, 2006 and i-CAT volumetric tomograms were taken at that time. I will respond to the questions posed in your recent letter in numerical order.
>
> 1.  On 05/08/06 Ms. Sullivan continued to experience pain in the right temporomandibular joint (TMJ) region. There was pain on palpation and function of the right TMJ and persistent joint sounds were detected. Radiographic CT imaging revealed posterior displacement of both TMJ condyles and a significant cortical bony defect of the left condyle. She continues to wear an intraoral appliance. We discussed the possibility of surgical intervention in the future in addition to continued use of her appliance and physical therapy.
>
> 2.  Because surgery of the right TMJ remains an option, it is difficult to state that she has reached a medical end point treatment of a maximum medical improvement.
>
> 3.  Dr. McKechnie's records dated 05/29/03 document his evaluation of her status 13 days following the motor vehicle accident in question. At that time he recorded that Ms. Sullivan "hit (the) left side of (her) head and maxillary centrals" (teeth numbers 8 and 9). There was "left side soft tissue swelling in (the) joint" and the "mandible deviates to (the) right side upon opening[.]" On 12/04/03 Dr. McKechnie referred Ms. Sullivan to this office for further evaluation. Dr. Fisher's records from 05/09/96 and Dr. Hardy's records from 04/25/01 clearly exclude any findings of TMJ related problems on those dates. These findings are consistent with my opinion that the injuries from the 05/16/03 accident are the cause of her ongoing TMJ related problems.
>
> 4.  After more than two years of treatment, Ms. Sullivan's condition continues to trouble her to varying degrees. There is every reason to believe she will continue to have episodic flare-ups of pain and

4

functional impairment and the possibility of surgical intervention
remains.

5. Restricting the diet to softer foods is necessary to manage pain in these
   conditions. Yawning, yelling and other activities requiring wide
   opening of the mouth should be avoided.

6. Limiting excessive jaw functions is important, although most people do
   not think of this in the same manner as a knee or ankle injury. Eating,
   talking, yawning, etc., are taken for granted and when someone
   develops a TMJ problem the thought of limiting these activities may be
   hard to accept. Behavioral modification is a necessary part of long term
   management of these problems. She will continue to need to wear her
   intraoral appliance, she will likely need physical therapy at times, and
   the day may come when she will be a candidate for TMJ surgery.

7. Ms. Sullivan will continue to need her intraoral appliance for the
   foreseeable future. This device may have a useable life span of three to
   five years, depending on wear and tear.

8. There may be periods of time when she will need additional therapy
   including physical therapy, medications, Botox injections and/or
   surgery. Prevention by behavioral modification is also important.

9. The long term prognosis in this case may be difficult to assess at this
   time. This is due to the documented bony changes in the left TMJ
   condyle and the question of TMJ surgery which remains unanswered.
   Certainly, additional trauma would be a concern as she is quite
   vulnerable to a significant worsening of her condition. If the
   circumstances lead us in the direction of surgery, the prognosis would
   be subject to substantial change. At this time, it is my opinion that Ms.
   Sullivan's prognosis regarding her TMJ condition is fair.

(Doc. 18-22.)

On October 11, 2006, Ms. Sullivan's physical therapist discharged Ms. Sullivan
from physical therapy.

On July 27, 2006, Allstate sent a letter to Ms. Sullivan, offering $15,000 to settle
her claims against Allstate in addition to the $25,000 settlement she had received from
Allstate through the Atkinson Policy. Allstate stated that it was "obviously a very serious

5

injury" and that it had "evaluated it as such." (Doc. 18-8.)  It stated that "[h]opefully we can discuss this case further[.]"  *Id.*

In a letter dated September 26, 2006, Ms. Sullivan, through counsel, enclosed new medical records and bills that increased the total bills to $10,133.50.  Again, Ms. Sullivan described her treatment to date and her prognosis at length.  Ms. Sullivan stated that her injuries were permanent in nature and that "[t]here can be no serious dispute that [her] damages are valued in excess of $100,000." (Doc. 18-9 at 2.)  She then compared her injuries to those suffered by the plaintiff in another case in which Allstate offered $35,000 and a jury ultimately returned a verdict for $165,000.  Ms. Sullivan, through counsel, demanded that Allstate "revisit and re-evaluate this claim, and tender the available $75,000 UIM limits." (Doc. 18-9 at 3.)

In a letter dated October 5, 2006, Allstate stated that "in order to re-evaluate this claim [it] will need to obtain all of [Ms. Sullivan's] prior dental and orthodontic records." (Doc. 18-10.)  Allstate asked Ms. Sullivan to authorize the release of the records and offered to pay the cost of obtaining them.  If Ms. Sullivan preferred to obtain the records herself, Allstate stated that it would need "all the records from Dr. Culver, Dr. Fischer, Dr. McKechnie and Dr. Hardy" and "any dental films along with the records." *Id.* Allstate stated that "[u]pon receipt of this documentation [it] plan[ned] to have a record review and possibly an IME." *Id.*

On or about November 3, 2006, Ms. Sullivan advised Allstate that, for more than a year, it had all of her prior dental and orthodontic records since she was nine years old. When Allstate indicated it was waiting for paperwork, Ms. Sullivan, through counsel, sent a November 14, 2006 letter recounting her version of the facts and asking that Allstate review the records in its possession and respond to her policy limits demand.

By letter dated November 27, 2006, Ms. Sullivan acknowledged Allstate's offer of $25,000 in benefits on her UM claim.  She then demanded copies of the M.S. Policy, the Atkinson Policy, and a certified statement pertaining to certain information contained

in the Atkinson Policy's declarations page. Thereafter, Allstate agreed to obtain the policies, however, it noted that it would have to obtain the Atkinson Policy through another department and questioned why it was needed. Allstate ultimately provided the requested information for the M.S. Policy, but not for the Atkinson Policy. At the time of Ms. Sullivan's request, her claim under the Atkinson Policy had been resolved and she had executed a release of Allstate.

By letter dated January 4, 2007, Ms. Sullivan suggested that the parties attempt to resolve their dispute through alternative dispute resolution, pre-suit mediation, or arbitration. Ms. Sullivan stated that she consented to arbitration under the M.S. Policy and asked whether Allstate would also consent to arbitration.

On January 29, 2007, Ms. Sullivan forwarded to Allstate her medical records and bills through January 2, 2007. At the time, the medical bills totaled $10,795.50. As of the filing of Ms. Sullivan's opposition to summary judgment, this amount has remained unchanged.

In a letter dated April 19, 2007, Allstate responded to Ms. Sullivan's request for mediation and arbitration as follows:

> The problem is that I offered my full authority to settle the claim and
> therefore have no money to use at mediation. I am not a big fan of
> arbitration since it is my experience that a jury is usually more realistic. At
> this point we are at an impasse. I believe your demand has always been the
> policy limit or $75,000 remaining [UM] coverage and my offer is $25,000
> plus the medical coverage of $5,000. We paid $4,092.02 in medical
> payments already which leaves $908.98 to be paid.

(Doc. 18-17.) Allstate asked for a courtesy copy of Ms. Sullivan's proposed Complaint and stated that the parties "will have to go through the discovery process and see if any new information develops." *Id.*

Thereafter, by letter dated October 23, 2007, Ms. Sullivan requested that Allstate pay $25,000 "without prejudice to either party's right to further dispute the amount of additional benefits to which Ms. Sullivan may be entitled." (Doc. 18-18.) On December

6, 2007, Allstate acknowledged Ms. Sullivan's request for an "advance payment" of $25,000, asked for an updated status report regarding Ms. Sullivan's condition including whether she was still receiving treatment since the updated records of 1/29/07.  Allstate asked for Ms. Sullivan's "settlement position/demand to resolve this in its entirety." (Doc. 18-19.)  In April of 2008, Allstate later faxed the same letter to Ms. Sullivan's counsel, adding the following handwritten note dated 4/22/08: "Todd: Are we any closer on this one?  Maybe meet with your client for 'update[.]'" (Doc. 18-19.)  On August 20, 2008, Allstate sent Ms. Sullivan's counsel a letter which stated as follows:

> This matter once again, came up on diary.
>
> I never received any response to my letter of 12/6/07 which was also faxed in April.
>
> I feel in light of your 10/23/07 letter a meeting with your client would benefit both sides and bring me up to speed as to Kim's present circumstances.
>
> I will be in Burlington in the afternoon of 8/28 & the morning of 8/29/08. Any chance of a meeting?

(Doc. 18-20.)  Ms. Sullivan apparently did not respond to this request.

Since January of 2007, Ms. Sullivan has provided Allstate with two pages of medical records that indicate an appointment in May of 2008 in which it is reported that Ms. Sullivan is wearing her splint all the time, it fits well, and her bite is even, and an April 29, 2009 record indicating that she has not worn the splint for four or five months, and if she now wears it, her TMJ hurts.  No medical bills were submitted as part of these records.  Dr. Crandall's May of 2006 report has apparently not been updated.

On May 13, 2009, Ms. Sullivan filed suit against Allstate.  In her Complaint, she does not separate her claims into separate counts.  She nonetheless appears to allege a claim under Vermont's Consumer Fraud Act (the "CFA"), a claim of breach of the implied covenant of good faith and fair dealing, and a claim of bad faith in the adjustment of her UM claim.  She seeks a determination that she is entitled to underinsured motorist benefits, a determination of underinsured motorist benefits and other damages due to her

8

from Allstate, punitive damages for bad faith, treble damages under the CFA, prejudgment interest, attorney's fees and costs.

Allstate seeks summary judgment solely with regard to Ms. Sullivan's CFA and bad faith insurance claims.

## II.   **Disputed Facts.**

The parties dispute whether Ms. Sullivan was discharged from physical therapy entirely, or only a particular course of physical therapy. Ms. Sullivan produced no evidence that her physical therapy is ongoing.

The parties also dispute whether Ms. Sullivan advised Allstate, pre-suit, of her lost income claim. The correspondence upon which Ms. Sullivan relies in disputing this fact has not been submitted to the court. Allstate, however, acknowledges receipt of the correspondence, and asserts that it does not contain a quantifiable lost income claim. Ms. Sullivan, in turn, does not dispute this characterization of her counsel's letter.

## III.  **Conclusions of Law and Analysis.**

### A.   **Standard of Review.**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(c).

"A party moving for summary judgment bears the burden of establishing that no genuine issue of material fact remains for trial." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir. 1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); *Eastman Mach. Co. v. United States*, 841 F.2d 469, 473 (2d Cir. 1988)).   In reviewing the record, the court construes the evidence "in the light most favorable to the nonmoving party, and draw[s] all inferences and resolve[s] all ambiguities in favor of the

nonmoving party." *In re Omnicom Group, Inc. Securities Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (citation omitted). However, if a "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment on that cause of action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Jaramillo v. Weyerhauser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) ("when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.").

In this case, federal jurisdiction is based on diversity of citizenship. Accordingly, the court applies the substantive law of Vermont, the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443, (2d Cir. 2005).

### B. Consumer Fraud Act Claim.

Ms. Sullivan asserts that the M.S. Policy contains illusory and misleading provisions about the availability and prospect of arbitration of first-party claims and asserts that Allstate has violated the CFA by issuing the M.S. Policy that contains these provisions. Allstate seeks summary judgment on Ms. Sullivan's CFA claim, contending that: (1) the CFA does not apply to insurance; (2) Ms. Sullivan is not entitled to bring a CFA claim because the M.S. Policy was neither issued to her, nor purchased by her and she did not rely upon any representations contained within it; and (3) a CFA claim cannot be based upon an arbitration provision that plainly requires both parties' consent to arbitration and which does not confer any benefits on Ms. Sullivan. The court need only address the second of these claims to rule on Allstate's motion for partial summary judgment.

The Vermont Supreme Court has identified the essential elements of a CFA claim as follows:

The statute prohibits deceptive acts and practices in commerce, which a complainant must establish with proof of three elements: (1) the representation or omission at issue was likely to mislead consumers; (2) the consumer's interpretation of the representation was reasonable under the circumstances; and (3) the misleading representation was material in that it affected the consumer's purchasing decision.

*Jordan v. Nissan North America, Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465, 468, 853 A.2d 40, 43 (2004); 9 V.S.A. § 2453(a).

In *Wilder v. Aetna Life & Casualty Ins. Co.*, 140 Vt. 16, 433 A.2d 309 (1981), the Vermont Supreme Court rejected the CFA's application to insurance:

To fall within the scope of the Act, the "unfair methods of competition" or "unfair or deceptive acts or practices" must occur "in commerce." 9 V.S.A. § 2453(a). The business of insurance is clearly within commerce, *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S. Ct. 1162, 88 L.Ed. 1440 (1944). However, the selling of an insurance policy is not a contract for "goods or services" within the meaning of 9 V.S.A. § 2461 allowing for civil penalties. Insurance cannot legitimately be labeled either goods or services as the Legislature has defined those terms. *See* 9 V.S.A. §§ 2451a(b), (c).

*Wilder*, 140 Vt. at 18-19, 433 A.2d at 310. After the *Wilder* decision, as Ms. Sullivan correctly points out, in 1985, the Vermont Legislature amended the CFA's definition of "goods and services" to include "intangibles" and "services of any kind." 9 V.S.A. § 2451a(b). The Vermont Supreme Court has not yet determined whether this language extends the CFA to insurance. *See Greene v. Stevens Gas Service*, 2004 VT 67, ¶ 17, 177 Vt. 90, 98, 858 A.2d 238, 245 ("even if the Consumer Fraud Act applies [to insurance]," it does not apply to a mere coverage dispute).

This court need not decide whether the CFA applies to insurance because the Vermont Supreme Court has consistently reaffirmed *Wilder*'s further conclusion that a CFA claim may be brought only by one who has actually purchased, leased or contracted for the goods or services in question. *See Wilder*, 140 Vt. at 19, 433 A.2d at 310 (rejecting claim brought by a policy holder's children as "we are not dealing with a

11

contractual situation between buyer and seller. We are asked to read into the Act a transaction one step removed."). The CFA defines a "[c]onsumer" as "any person who purchases, leases, contracts for or otherwise agrees to pay consideration for goods or services . . . ." 9 V.S.A. § 2451a(a). Vermont law requires a party asserting a CFA claim to demonstrate that the misleading representation "affected the consumer's *purchasing decision*." *Jordan,* 2004 VT 27, ¶ 5, 176 Vt. at 468, 853 A.2d at 43 (emphasis supplied). Here, Ms. Sullivan neither purchased the M.S. Policy, nor was it issued to her. She did not rely on the M.S. Policy in making a purchasing decision and she is not a "[c]onsumer" as defined by the CFA. As a matter of law, she cannot assert a CFA claim based upon the provisions of the M.S. Policy. Allstate's motion for summary judgment with regard to Ms. Sullivan's CFA claim is thus hereby GRANTED and the claim is hereby DISMISSED.

### C. Bad Faith Claims.

In her Complaint, Ms. Sullivan appears to assert both a breach of the implied covenant of good faith and fair dealing claim as well as a bad faith insurance claim. To the extent Ms. Sullivan seeks to recover for a breach of the implied covenant of good faith and fair dealing, she must first establish a contractual relationship between herself and Allstate. *See Harsh Properties, Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 192, 202, 932 A.2d 1045, 1050 ("A cause of action for breach of the covenant of good faith and fair dealing can arise only upon a showing that there is an underlying contractual relationship between the parties . . . .") (quoting *Monahan v. GMAC Mort. Corp.*, 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 893 A.2d 298). The M.S. Policy states that it is a legal contract between Allstate and Maryanne Sullivan and her spouse. Neither party has addressed whether Ms. Sullivan may assert an implied covenant of good faith and fair dealing claim, and Allstate has not moved for summary judgment with regard to it. Accordingly, at this juncture, the court need not address the claim further.

Allstate, however, does seek summary judgment with regard to Ms. Sullivan's other bad faith claim. In her Complaint, Ms. Sullivan recites some of the facts relating to the adjustment of her UM claim and asserts "[a]s a result of Allstate's acts and omissions in delaying and failing to pay under-insured motorist benefits to her, Plaintiff has suffered damages in excess of $75,000." (Doc. 1, ¶ 49.) In her opposition, she characterizes her bad faith claim as follows:

> The thrust of Plaintiff's bad-faith claim is that, despite its own assessment some three years after the crash that Kim Sullivan's case involves "obviously a very serious injury," Allstate failed to act in good faith in dealing with Plaintiff on her underinsured motorist claim, in claiming that it could not properly evaluate her claim unless it was given records that it had long-ago already been given, in failing to pay to her at least the amounts it did not dispute she was entitled to, in refusing to offer more than $25,000 to settle her claim, and in refusing to even consider any alternative means to resolve this short of litigation.

(Doc. 28 at 6.)

In Vermont, a party asserting a bad faith insurance claim must establish the following essential elements: "(1) the insurance company had no reasonable basis to deny benefits of the policy, and (2) the company knew or recklessly disregarded the fact that no reasonable basis existed for denying the claim." *Bushey v. Allstate Ins. Co.*, 164 Vt. 399, 402, 670 A.2d 807, 809 (1995). "An insurance company may challenge claims that are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis." *Id.* "Thus, the rule limits recovery to instances in which an insurer not only errs in denying coverage but does so unreasonably." *Id.*

"A motion for summary judgment by an insurer compels a court to consider both elements of the bad-faith tort. If the insurer prevails on either prong, the court must grant the insurer's motion." *Bushey*, 164 Vt. at 403, 670 A.2d at 810. In other words, if a plaintiff cannot establish unreasonableness "because the claim was fairly debatable as a matter of law, [the court] must grant the summary judgment motion without reaching the

13

question of the insurer's knowledge." *Id.* (citing *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1445 (10th Cir. 1993) (insurer entitled to summary judgment because no genuine issue of material fact existed regarding insurer's legitimate dispute about insured's claim.); *see also Wilson v. State Farm Mut. Auto. Ins. Co.*, 795 F. Supp. 1077, 1081 (D. Wyo. 1992) (on claim of bad faith, insurer was entitled to summary judgment where claims for medical payments were "fairly debatable").

Here, there is no reasonable question of liability. There is also no question that there was delay on both parties in the settlement of Ms. Sullivan's UM claim. Ms. Sullivan, however, points to no evidence that such delay by Allstate was unreasonable under the circumstances other than a request for medical records which she asserts Allstate already had. She cites no authority for a bad faith insurance claim on this basis.

More importantly, throughout the adjustment process, there was a significant and legitimate debate regarding the value of Ms. Sullivan's UM claim. At the time of filing her Complaint, Ms. Sullivan's documented medical expenses totaled $10,795.50. She does not deny that Allstate offered her over twice that amount and she points to no evidence that Allstate refused to pay her medical expenses in full. Instead, she appears to assert that Allstate had an obligation to pay her $25,000, and had a further obligation to attempt alternative dispute resolution before she filed suit. Again, she points to no legal basis for these duties.

In analyzing Ms. Sullivan's claim of bad faith, the court must also consider Dr. Crandall's May 2006 report--the only evidence of Ms. Sullivan's long term prognosis and her potential medical bills. Dr. Crandall's report indicates that it is possible that Ms. Sullivan has not reached a medical end result, that future TMJ surgery is possible although not certain, and that Ms. Sullivan's long term prognosis is both fair and difficult to assess. Dr. Crandall opined as to what Ms. Sullivan's future medical expenses might

14

include, but there is no evidence before the court regarding the amount of those additional expenses.[3]

Against this backdrop, the court cannot find that Ms. Sullivan has adduced sufficient admissible evidence to establish that Allstate acted unreasonably in adjusting her claim. Because she has not established her entitlement to alternative dispute resolution or the amounts she claims Allstate failed to provide, the nature and extent of her claims remain "fairly debatable" and bad faith does not exist as a matter of law. *See Bushey*, 164 Vt. at 403, 670 A.2d at 810; *see also Dunn v. State Farm Fire & Casualty Co.*, 927 F.2d 869, 873 (5th Cir. 1991) (court can determine as a matter of law that insurer clearly had arguable reasons to deny insured's claim because insured could not establish entitlement to a directed verdict on its contract claim) (cited with approval in *Bushey*, 164 Vt. at 404, 670 A.2d at 810).

Fed. R. Civ. P. 56(c) and Vermont law require dismissal of a bad faith insurance claim where either prong of the *Bushey* test has not been met. *See Bushey*, 164 Vt. at 403, 670 A.2d at 809. This approach is consistent with that of other states. *See Strong v. Unumprovident Corp.*, 393 F. Supp. 2d 1012, 1024-25 (D. Idaho 2005) (finding that, under a bad faith statute identical to Vermont's statute, because there was medical evidence on record to support denial of benefits, there is a reasonable basis for not paying the claims as a matter of law); *Estrada v. State Farm Mut. Auto. Ins. Co.*, 897 F. Supp. 321, 325 (W.D. Tex. 1995) (summary judgment in favor of the insurance company, holding "[a]fter properly considering the evidence of the physicians' opinions, the Court concludes State Farm's explanation that it delayed payment because of a bona fide dispute over the appropriate medical management of [plaintiff's] condition provides a reasonable basis for the delay in payment."); *Gardner v. Hartford Ins. Accident &*

---

[3] This alone renders the value of Ms. Sullivan's UM claim fairly debatable. *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473-74 (2005) ("if it is undisputed that evidence existed creating a genuine dispute as to . . . the nature and extent of the insured's injuries, or the value of the insured's damages, a court can almost always decide that the claim was fairly debatable as a matter of law.")

*Indemn. Co.*, 659 N.W.2d 198, 206 (2003) ("Where an objectively reasonable basis for denial of claim actually exists, the insurer cannot be held liable for bad faith as a matter of law.").   The cases Ms. Sullivan cites for a contrary approach are inconsistent with Vermont law and cannot be followed by this court.

For the reasons stated above, Allstate's motion for summary judgment as to Ms. Sullivan's bad faith insurance claim is hereby GRANTED and that claim is hereby DISMISSED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _3rd_ day of August, 2010.

Christina Reiss
United States District Court Judge